## UNITED STATES v. ALUMINUM CO. OF AMERICA et al.

District Court,. S. D. New York.
July 16, 1937.

Robert H. Jackson, Asst. Atty. Gen., Walter L. Rice and John W. Aiken, Sp. Assts. to Atty. Gen., and John C. Herberg, Edward Dumbauld, F. Gwyn Harper, all of Washington, D. C., Sp. Attys., for United States of America, petitioner.

Milbank, Tweed, Hope & Webb, of New York City (Timothy N. Pfeiffer, Morris Hadley, Edgar P. Baker, all of New York City, of counsel), for Aluminium Limited.

LEIBELL, District Judge.

The United States of America instituted in this court and District on April 23, 1937, a suit in equity under the Anti-Trust Laws (15 U.S.C.A. §§ 1–7, 15 note; 38 Stat. 730) against the Aluminum Company of America and sixty-two other defendants, including Aluminium Limited. The petition or bill of complaint alleges in part:

"1. This petition is filed and the jurisdiction of this Court is invoked to obtain equitable relief against said defendants because of their violations jointly and severally, as hereinafter alleged, of the Act of Congress of July 2, 1890, known as the Sherman Anti-Trust Act [15 U.S.C.A. §§ 1–7, 15 note]. * * *

"40. Defendants have violated and are now violating the provisions of said Sherman Anti-Trust Act, by monopolizing, attempting to monopolize, combining and conspiring to monopolize, and contracting, combining and conspiring to restrain, interstate and foreign trade and commerce, and more particularly by enabling the Aluminum Company to acquire and maintain a monopoly of bauxite, alumina, aluminum, and products manufactured therefrom, and by excluding others from the fair opportunity to engage in interstate and foreign trade and commerce in said articles. * * *

"72. In 1928 Aluminum Company caused to be incorporated under the laws of the Dominion of Canada defendant Aluminium Limited to which Aluminum Company transferred all its business and holdings outside of the United States, except defendant Surinaamsche Bauxite Maatschappij, defendant Cedar Rapids Transmission Company, Limited, defendant Alcoa Power Company, Limited, and said Prodotti Chimici Napoli. As consideration for said properties, defendant Aluminium Limited issued all of its capital stock to Aluminum Company which thereupon distributed said stock proportionately among its own stockholders, Andrew W. Mellon, R. B. Mellon, and Arthur V. Davis, who together then held the majority of the capital stock of Aluminum Company, receiving more than 50 per cent of said stock of defendant Aluminium Limited. As a result of said stock distribution, the ownership of a majority of the shares of stock in both Aluminum Company and defendant Aluminum Limited has since remained in a small group of persons, defendants herein, common to both corporations, prominent in the organization of Aluminum Company, who through such stock ownership, the close relationships among officials of both corporations, and the use by both corporations of the same banking, legal, and other facilities have since controlled the policies and activities of both Aluminum Company and defendant Aluminium Limited. The officers and directors of Aluminium Limited from the time of its organization have been, almost without exception, individuals formerly identified with the direction and management of Aluminum Company. Defendant Aluminium Limited has offices in the United States, and many of its directing officials function and reside there."

The prayer for relief asks, among other things, "(2) That the Court adjudge and decree that all of the defendants herein have monopolized, attempted to monopolize, combined and conspired to monopolize, and contracted, combined and conspired to restrain, the aforesaid interstate and foreign trade and commerce, in violation of sections 1 and 2 of said Sherman Anti-Trust Act [15 U.S.C.A. §§ 1, 2]."

Shortly prior to May 20, 1937, the writ of subpœna, issued on said bill of complaint, was attempted to be served on Aluminium Limited by the service of said process on Mr. E. K. Davis, as president of Aluminium Limited, in Massachusetts, and also on Mr. G. O. Morgan, Jr., as vice president, in New Jersey, the states in which those officers have their homes.

On May 20, 1937, Aluminium Limited, appearing specially herein for the sole purpose of the motion, served notice that it would move this court on June 15th "for an order quashing and setting aside the writs of subpoena issued herein and declaring invalid and void any service of process upon Aluminium Limited, a corporation organized under the laws of the Dominion of Canada and having its statutory office at Toronto, Canada, and other offices at Montreal, Canada, and Geneva, Switzerland, on the ground that this Court has no jurisdiction over the person of the said Aluminium Limited, for the reason that it is a foreign corporation which is not and has at no time been an inhabitant of, found in, or engaged in the transaction of business in any judicial district in the State of New York or the State of New Jersey or the Commonwealth of Massachusetts or in any judicial district in the United States so as to be amenable to service of process therein; and further, that the said Aluminium Limited has neither voluntarily appeared in this suit nor waived due service of process upon it. * * *"

A writ of subpoena issued under the aforesaid bill of complaint was also served on May 21, 1937, on defendant Aluminium Limited by the service of said process on Edward K. Davis, its president, at the offices of Aluminium Limited in the British Empire building, No. 620 Fifth avenue in the county of New York, state of New York, which is within the jurisdictional limits of this court in the Southern District of New York.

The allegations contained in the affidavit in support of this motion to quash the writ were put in issue by an affidavit filed on behalf of the plaintiff. The court has taken testimony on the issues thus raised. A great amount of documentary evidence, most of it from the New York office of Aluminium Limited, and the testimony of E. K. Davis, president of Aluminium Limited, and of Ward Van Alstyne, vice president of Aluminium Union Limited, and of two investigators comprise the record of the hearing. On the hearing it was understood and so stated on the record that the defendant Aluminium Limited's motion was directed to any process served anywhere on said defendant in the United States, but specifically to the process served here in New York City on May 21, 1937, as aforesaid.

Aluminium Limited is a Canadian corporation incorporated by Letters Patent of the Dominion of Canada dated May 31, 1928, with its head office or legal domicile at the city of Toronto in the Province of Ontario. It has general offices in the city of Montreal in the Province of Quebec. It also maintains offices for the transaction of business in the city of Geneva, Switzerland. It asserts that it "has for convenience space in the British Empire building in the city of New York but no domestic, interstate or business local to the United States whatsoever is there transacted"; that this space is "for the convenience of individuals and not for the transaction of business"; that "no permanent organization is maintained there nor is any business transacted there"; and that "no records relating to the business of Aluminium Limited and its subsidiaries are kept there, except temporarily for examination by such officers, directors or employees of Aluminium Limited or its subsidiaries as may be there from time to time."

The question before the court on this motion is whether Aluminium Limited is "found" in the Southern District of New York within the meaning of section 12 of the Clayton Act (title 15 U.S.C.A. § 22 [15 U.S.C.A. § 22]) which reads as follows:

"§ 22. *District in Which to Sue Corporation.* Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found. (Oct. 15, 1914, c. 323, § 12, 38 Stat. 736.)"

The word "found" has been defined by the United States Supreme Court in respect to its use in section 7 of the Sherman Act (15 U.S.C.A. § 15 note), in an opinion in the case of People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 84, 38 S.Ct. 233, 234, 62 L.Ed. 587, Ann. Cas.1918C, 537, as follows:

"Section 7 of the Sherman Act provides that suits of the character of the one now under consideration may be brought in the district in which the defendant 'resides or is found.' When applied to a corporation this requirement is the equivalent of saying that it must be present in the dis-

trict by its officers and agents carrying on the business of the corporation. In this way only can a corporation be said to be 'found' within the district. In that manner it may manifest its submission to local jurisdiction and become amenable to local process."

And the court explained at page 87 of 246 U.S., 38 S.Ct. 233, 235, 62 L.Ed. 587, Ann.Cas.1918C, 537, that: "Each case depends upon its own facts. The general rule deducible from all our decisions is that the business must be of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the state or district where service is attempted."

See, also, Eastman Co. v. Southern Photo Co., 273 U.S. 359, at pages 373, 374, 47 S.Ct. 400, 71 L.Ed. 684.

The term "found" in section 12 of the Clayton Act (15 U.S.C.A. § 22), connotes something more than "transacting business." That a corporation is "transacting business" within a judicial district is sufficient on which to base the venue of the suit under the act. But process in the suit can be served only "in the district of which it [the corporation] is an inhabitant, or wherever it may be found." The officers or agents of the corporation must be within the district, conducting with some continuity business of the corporation of such a nature and to such an extent that it will "enable us to say that the corporation is here," before we can conclude that it has become amenable to process. Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 115 N.E. 915.

Aluminium Limited claims that "It is exclusively a holding corporation. It does not mine, smelt, manufacture or sell bauxite, alumina, aluminum, or any products thereof; it does not employ any salesmen. It has no showrooms and maintains no stock of goods in the United States or elsewhere."

That it "owns and holds the stocks of a large number of corporations organized and operating exclusively in the British Empire, Europe and Asia. The corporations which are owned or controlled, directly or indirectly, by Aluminium Limited through stock ownership together engage in every phase of the aluminium industry from the mining of bauxite ore to the production and fabrication of the metal. The operations of Aluminium Limited, in addition to holding the stocks of such corporations, are largely confined to integrating the manufacturing and selling operations of its subsidiaries, directing their policies and aiding such financing as they may require. Thus apart from the management of its internal affairs, the activities of Aluminium Limited are wholly of an advisory and supervisory character."

The various steps in the production of aluminum are alleged in paragraph 37 of the bill of complaint herein:

"37. The fundamental substance in the production of the metal aluminum is bauxite, an ore of reddish brown color found in extensive natural deposits, which when ground and chemically treated produces oxide of aluminum or alumina. In the production of aluminum this oxide is subjected to an electrolytic process through introduction into a bath of molten cryolite, with the result that the aluminum is deposited in a molten state on the bottom of the bath, being then drawn off and poured into molds or pigs. In the commercial production of aluminum by said electrolytic process, large quantities of electric energy are required which can be generated under favorable conditions more economically by water power than by steam."

The relationship of Aluminium Limited as a holding company to its underlying or subsidiary companies, whether partially or wholly owned, and the manner in which Aluminium Limited's organization (personnel) reflects that relationship is very fully and clearly set forth in a letter of its president, E. K. Davis, to Mario Bello, its regional manager at Turin for Italy, dated April 21, 1936, which was received as an exhibit at the hearing on the issue of jurisdiction. This letter is as follows:

"At or about the time you were appointed Regional Manager at Turin for Italy, Mr. Mejia suggested that I should, from time to time, tell you about the duties of a regional manager and explain how you fit into our organization as presently constituted.

"On the theory that what I may say on this subject is of some interest also to other members of our organization holding similar positions, I venture to distribute to a few people of Aluminium Limited's personnel a copy of this letter.

"In the first place, to put yourself into conformity with our methods of doing busi-

ness, it is important that you should see and realize the essential difference between Aluminium Limited as a holding company and the underlying or subsidiary companies, whether partially or wholly owned. It is not the purpose of this letter to comment upon that difference,—I merely wish to say that you should understand the difference as preliminary to reading this letter.

"Having gotten the distinction in mind, you will readily perceive that Aluminium Limited owns practically no fixed assets. It produces no commodity which is bought and sold in the ordinary course of trade; it buys little or nothing of that sort and sells little or nothing of that sort. Its whole existence is centered around the fact that it owns shares of stock in companies engaged in or related to the aluminium business and has lent sums of money to some of those companies and therefore stands in the dual position of stockholder and creditor.

"It will not surprise you, therefore, when I say that Aluminium Limited's organization (personnel) is intended to reflect and does pretty well reflect the facts above stated. None of us (unless we have positions also in companies other than Aluminium Limited) is engaged in mining, smelting, fabricating or selling. We are, however, organized in such a way as to be or become familiar with all those activities as they are carried on in the companies in which we have an interest in the share capital or from whom we have substantial sums of money due to us. Broadly speaking, therefore, you can say that Aluminium Limited's personnel is engaged in (a) ascertaining what our underlying companies are doing, (b) advising them in connection with what they are doing, (c) effecting such changes in our investments or exercising such rights as our share ownership gives us to reflect our opinion of the way in which business should be carried on in the underlying companies.

"To accomplish this you find the personnel of Aluminium Limited divided into sections. One section consists of those who are principally concerned with the formal conduct of Aluminium Limited's own business and the formalities of our subsidiaries' business. They are and naturally have to be located in places where Aluminium Limited is qualified to transact business,—hence you find Mr. J. H. Alger, Secretary, at Montreal, which is one of the three places where Aluminium Limited

can transact business, and you find Mr. M. B. de Sousa Pernes at Geneva, which is another place where Aluminium Limited is qualified to act in a corporate manner. Those two gentlemen and those by whom they are surrounded are concerned with all the corporate formalities, not only of Aluminium Limited, but, indirectly and through the proper channels, with the corporate formalities of all the underlying companies.

"All the remaining part of Aluminium Limited is then broadly divided into three sub-divisions according to the character of work to be done. They are: moneys and accounts over which Mr. Morgan presides; operating, engineering and research over which Dr. Blough presides, and commercial matters over which I preside.

"Then, the aforesaid 'remaining part of Aluminium Limited' having been, as it were, vertically divided between Messrs. Blough, Morgan and Davis, it is horizontally divided into administrative and executive functions. Everything administrative is put at a place where Aluminium Limited is qualified to transact business, viz., Montreal and Geneva, except, however, in the case of the so-called commercial department, where the administrative part of Aluminium Limited's commercial work has been separately incorporated (Aluminium Union Limited) and is at London.

"It follows therefore—to take a typical case—that all Aluminium Limited's executive functions in what concerns operating, engineering and research reside in Dr. Blough personally wherever he may be, (mostly at New York), but everything in his department that concerns administration is found at Montreal or Geneva in the persons of Dr. Harder, Mr. Richardson and others.

"Similarly, respecting moneys and accounts, you find all its administrative features residing at Montreal in or under Mr. J. W. McKee, whereas the executive features thereof reside in Mr. G. O. Morgan, Jr. and follow him wherever he goes, mostly New York.

"Having carried the organization so far, we have additionally a peculiar unit in our set-up sometimes referred to descriptively as the 'corps mobile'. The two gentlemen who are presently in this 'corps' have nothing to do with administrative work. They are wholly connected with Messrs. Morgan, Davis and Blough as they function in an executive capacity. The pe-

culiarity of this corps is that when a given member thereof leaves his headquarters at New York he automatically takes over to himself all the executive functions of his three principals but only in what concerns subjects specifically delegated to him. Hence, to take an example with which you are familiar, so long as Mr. Mejia, being one of the two members of the corps, is on European duty with an assignment affecting our interests in Italy, you find in him the combined interest of Messrs. Morgan, Blough and Davis in our Italian affairs, exception being made, however, to all of Davis' responsibilities which have been incorporated in Aluminium Union Limited.

"If you have well followed the description so far, it will not surprise you that, as a further elaboration in the organizaton of Aluminium Limited, you discover that the Company, in respect to some important parts of the world, has appointed nationals of certain countries entrusted, regionally, with all the affairs of Aluminium Limited in their respective regions, no matter whether they are affairs belonging in the first category heretofore described as given to Messrs. Alger and M. B. de Sousa Pernes, or whether they are in the second category described as having been divided first vertically between Messrs. Morgan, Blough and Davis, and then horizontally between administrative duties and executive duties,—exception again being made to that part of Davis's responsibilities which are on the administrative side of our commercial problems and are separately set up in Aluminium Union Limited.

"The regional managers have nothing to do with Aluminium Union Limited but they have everything to do, in their respective regions, with all functions which have been retained in Aluminium Limited as a separate corporation.

"If anything in the foregoing is not clear, Mr. Mejia or Mr. Henry-Couannier would be glad to clarify it."

Copies of this letter were sent to the following representatives of Aluminium Limited—Mr. J. H. Alger, Montreal; M. B. de Sousa Pernes, Geneva; P. B. de Sousa Pernes, London; C. G. Bowen, New York; E. J. Mejia, Geneva; R. E. Powell, Montreal; W. V. Esperson, London; L. G. Bash, London; A. Henry-Couannier, Paris; Ludwig Braasch, Berlin; W. C. Binz,

Geneva and Aluminium Union Limited, New York, c/o Mr. W. Van Alstyne.

The business of Aluminium Limited, in which its personnel are engaged as described in the above letter, is the same business in which its executive heads are engaged at the corporation's New York offices. It is the important part of the business for which it was incorporated. As the letter indicates, the administrative and formal corporate functions of Aluminium Limited are performed in the Montreal or Geneva offices, but its executive functions, which are its main functions, are performed by its principal executive officers mostly in the New York offices, maintained principally for that purpose. These officers are (1) Mr. Edward K. Davis, the president, the chief executive officer, whose responsibilities include, as the letter states, "the administrative side of its commercial problems and are separately set up in Aluminium Union Limited"; (2) Mr. G. O. Morgan, Jr., a vice president in charge of moneys and accounts; (3) Dr. Earl Blough, until December 31, 1936, a vice president of Aluminium Limited and now the president of Aluminium Laboratories Limited, who as vice president of Aluminium Limited possessed all Aluminium Limited's executive functions in that concern's operating, engineering, and research. These three executives received salaries that totalled $108,000 in 1936. The offices of Aluminium Limited at the British Empire building in New York City are shared by Aluminium Laboratories Limited and Aluminium Union Limited, both 100 per cent. owned subsidiaries of Aluminium Limited. Mr. Ward Van Alstyne, a vice president of Aluminium Union Limited, a 100 per cent. subsidiary, also occupies an office in the Aluminium Limited suite in New York City. He has as an assistant, Mr. Charles Nash, with a separate room. Mr. John G. Bowen, an important "traveler" for Aluminium Limited, occasionally in New York, has an office in that suite.

Aluminium Limited's suite of offices at the British Empire building has been added to twice since it signed a ten-year lease in October, 1934. The annual rental now paid is $25,000. The suite covers 7,300 square feet, embraces 15 rooms, and is occupied by 20 persons, of whom 10 are employees of Aluminium Limited, exclusive of its officers. The annual cost of maintaining these offices, not including officers'

and agents' salaries, is $53,690, of which $4,700 is billed to other companies, the balance being absorbed by Aluminium Limited. A telephone switch board operator, a corps of stenographers, a filing clerk, and reception clerk give all the aid the executives require to conduct in New York the executive division of Aluminium Limited. The lease of the office suite provides that the tenant agrees to use the premises "sole for executive offices, for the business of the tenant to be conducted in a proper, lawful and reputable manner." The only name on the door and in the telephone book is Aluminium Limited. The stationery gives the New York telephone number and the New York cable address.

Aluminium Limited maintains large bank accounts in New York City and elsewhere in the United States and borrows money from banks in New York City and elsewhere in the United States. Mr. Morgan arranges for these loans and signs the notes here. He passes upon costs and other accounts forwarded to him from Montreal. He is the head financial man of Aluminium Limited and commutes to the New York office from his home in New Jersey. Among those officers whose signatures are on the cards at the banks are Mr. E. K. Davis, Mr. G. O. Morgan, Jr., and (formerly) Dr. Blough.

Mr. E. K. Davis, the president of Aluminium Limited, is the active head of its business. He supervises its subsidiaries, advises on their problems, gives them instructions, corresponds with their representatives here and abroad, determines policies, and in every way is the "chief" executive in fact over all the many and far-flung interests of Aluminium Limited. In addition to his executive duties, he also has "responsibilities which are on the administrative side of our (Aluminium Limited's) commercial problems and are separately set up in Aluminium Union Limited." He spends by far the greater part of his time at the New York office of Aluminium Limited. He directs and advises the regional managers of Aluminium Limited from the New York office. All his executive duties, as he described them, except voting the stock and attending directors' meetings, he performs from the New York office for the greater part of every year. He is in the same suite with Mr. Van Alstyne, vice president of Aluminium Union Limited, where he can perform his administrative duties in respect to the commercial problems of that subsidiary. The time Mr. Davis gives to the New York office has increased from 100 days in 1933 to 173 days in 1936, during which time the Aluminium Limited twice added to its office space in the British Empire building in New York City. When the experience, salary, authority, and activities of the officers of Aluminium Limited at the New York office are compared with those of its officers at Montreal, it is readily apparent that the main executive office of Aluminium Limited is in New York City.

These and many other facts relating to the business conducted by Aluminium Limited at its New York office, were developed in great detail at the hearings on this motion. The court has considered the proposed findings of fact submitted by both sides and has made its notations indicating the findings it has approved and adopted as the court's findings of fact on the issues raised on this motion. In reaching its conclusions in this matter, the court has eliminated from its consideration any evidence relating to the business independently transacted within this jurisdiction by any of the subsidiaries of Aluminium Limited. Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634. The court's conclusions herein are based on the evidence of the nature and character of the business transacted by Aluminium Limited as a separate corporate entity through its own officers and agents at its New York office.

Defendant Aluminium Limited, in the opinion of the court, is present in the Southern District of New York, actively and continuously engaged in transacting the business for which it was incorporated, through its principal executive officers and a permanent organization at an office in No. 620 Fifth avenue, borough of Manhattan, New York City, which it maintains for that purpose. Aluminium Limited in so transacting business at the premises aforesaid has subjected itself to the jurisdiction of this court in this district. Aluminium Limited is therefore "found" within this judicial district within the meaning of section 12 of the Clayton Act (U.S.C. title 15, § 22 [15 U.S.C.A. § 22]) and is subject to the process of this court in this suit.

The writ of subpœna issued out of this court on the bill of complaint in equity filed herein on April 23, 1937, was proper-

ly served on Aluminium Limited within the district on May 21, 1937, by the service on Edward K. Davis, its president, at its New York office, 620 Fifth avenue, New York City. This court, therefore, has jurisdiction of Aluminium Limited in this action. The motion of Aluminium Limited for an order quashing and setting aside the writs of subpœna issued herein and declaring invalid and void any service of process upon Aluminium Limited is denied. Aluminium Limited is allowed ten· days after service on its attorneys herein of a copy of the order to be entered on this motion, within which to serve and file its answer to the bill of complaint.

Submit order in accordance with this opinion on two days' notice.