**In re GRAND JURY SUBPOENAS DUCES TECUM ADDRESSED TO CANADIAN INTERNATIONAL PAPER COMPANY et al.**

District Court, S. D. New York.
July 21, 1947.

1014

Walter K. Bennett, Francis R. Shields, and Carlisle P. Myers, all of New York City, John F. Sonnett, Asst. Atty. Gen., and Seymour D. Lewis, Sp. Asst. to Atty. Gen., for the United States.

Mitchell, Capron, Marsh, Angulo & Cooney, of New York City, for Canadian International Paper Co. and International Paper Sales Co., Inc.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City (Ralph M. Carson, Porter R. Chandler and Roger R. Clisham, all of New York City, of counsel), for International Paper Co.

GODDARD, District Judge.

Three proceedings are involved respecting the validity of subpoenas duces tecum issued by a Grand Jury in an investigation conducted under the Sherman Act, 15 U.S.C.A. § 1 et seq. Because of the integrated nature of the corporate parties they were argued and heard together and by agreement all affidavits and evidence submitted in any of the proceedings may be considered as having been received in all. There is no substantial dispute as to the facts.

In the proceeding against International Paper Company the government is seeking by a Presentment of the Grand Jury of the Southern District of New York, submitted to the court June 20, 1947, a direction from the court in respect to the failure of International Paper Company, a New York corporation, to produce before the Grand Jury a vast amount of papers and documents belonging to and alleged to be in the physical control of two foreign corporations, (1) Canadian International Paper Company, a corporation of the Province of Quebec, Canada, and a wholly owned subsidiary of International Paper Company; (2) International Paper Sales Company, Inc., a corporation of the Province of Quebec, a wholly owned subsidiary of Canadian International Paper Company. The other two proceedings are motions by Canadian International Paper Company and International Paper Sales Company, Inc., who appear specially and seek an order quashing the purported service upon them of subpoenas duces tecum. Hereinafter International Paper Company, Canadian International Paper Company, and International Paper Sales Company, Inc., are referred to respectively as International, Canadian, and Sales.

The following subpoenas were served on the individuals described therein: (1) On John H. Hinman, John H. Hinman, as President of International and Canadian, to produce certain records of Canadian; (2) on International as International, as agent and parent of Canadian, by service on Harrison R. Weaver, a Vice-President of both Canadian and International, to produce certain books and records of Canadian; (3) on Harris R. Weaver, Harrison R. Weaver, as Vice-President of International and Canadian, to produce certain books and records of Canadian; (4) on William N. Hurlbut, William N. Hurlbut, as Vice-President of International and Canadian, to produce certain books and records of Canadian; (5) on Carl S. Volk, Carl S. Volk, as Treasurer of International and Assistant Treasurer of Canadian, to produce documents of Canadian; (6) on William A. Hanway, William A. Hanway, as Secretary of International and Assistant Secretary of Canadian, to produce documents of Canadian; (7) on Canadian by service on H. R. Weaver, Vice-President, to produce documents of Canadian; (8) on Canadian International Paper, Ltd. by service on W. A. Hanway, Secretary of International as agent, to produce books and records of Canadian International Paper, Ltd.; (9) on Sales by service on the Secretary of State of New York, to produce documents of Sales; (10) on Sales by service on W. A. Hanway, Secretary of International, as agent, to produce documents of Sales.

### General Facts.

International is a New York corporation with its principal place of business in the City of New York.

Canadian is a Quebec corporation with its main office in Montreal, Province of Quebec, Canada.

Sales is a Quebec corporation with its main office in Montreal, Province of Quebec, Canada.

International manufactures and sells in the United States many grades of paper, other than newsprint, produced from a number of its own or leased mills located in various states of the United States. Although International formerly manufactured newsprint at its mills in the United States since 1940 it has discontinued making newsprint in the United States and the manufacturing of newsprint has been carried on by its subsidiary Canadian in Canada. International owns all the outstanding stock of Canadian, except directors qualifying shares; also the funded debt of Canadian.

Canadian manufactures in Canada newsprint, sulphite pulp and lumber. It has no listed office in the United States but its officers have and share expense of a New York City office at 220 East 42nd Street with International. It has approximately 5000 permanent employees, and 9500 seasonal employees in Canada. Canadian also owns varying degrees of stock interest in other companies operating in Canada. Canadian owns all the stock and funded debt of Sales.

Sales is a Quebec corporation. Its business consists in buying and selling newsprint. Sales buys about 85% of the newsprint Canadian sells. Sales has approximately 43 employees in the United States, divided among six offices located in Chicago, Cleveland, Pittsburg, Boston, New York and Atlanta.

### Officers.

International and Canadian had the following common officers and directors until a few months prior to and at the time of the service of the subpoenas: R. J. Cullen was Chairman and a director of International, as well as a director of Canadian; J. W. Hinman is President of International and Canadian as well as a director of both; H. R. Weaver is a Vice-President and director of both International and Canadian; William N. Hurlbut is a Vice-President and director of both International and Canadian as well as having been a director of Sales up to December 27, 1946, and a Vice-President of Sales up to April 17, 1947; Carl S. Volk is Treasurer of both International and Canadian; W. A. Hanway is Secretary of International and until December 27, 1946 was Assistant Secretary of Canadian and Sales; A. R. Storm is Assistant Treasurer of International and until December 27, 1946 was Assistant Treasurer of Canadian.

Canadian and Sales have the following common officers: R. C. Doane is President of Sales and Vice-President of Canadian

in charge of the sales of newsprint; S. L. de Carteret is Vice-President and General Manager of Canadian as well as Vice-President of Sales; Roy Campbell is Secretary of both Canadian and Sales; J. P. Monge is Treasurer of Sales and Assistant Treasurer of Canadian; E. T. Crooker is Vice-President of Canadian and Sales.

International has a board of seventeen directors, six of whom are directors of Canadian. Canadian has a board of nineteen directors, seven of whom are members of Sales' board of directors.

The Chairman of the board, the President and the Vice-President of International are three members of the five member Executive Committee of Canadian, two of such members constituting a quorum.

### Methods of Operation.

In order to completely understand the methods of operation it is essential to ascertain what in fact, as distinguished from mere form, are the methods of operation of the respective corporations.

International manufactures various types of paper with the exception of newsprint, in the United States and sells through its employees directly to customers in the United States.

Canadian manufactures principally newsprint in Canada. The main portion of Canadian's source of supply is from forest areas which are Crown lands and leased to Canadian. Canadian contends that it makes no sale of newsprint to purchasers in the United States. Canadian, operating under the provisions of a so-called "Plan for the Allocation of Newsprint Contracts," entered into in 1935 between the former International Paper Company, the former International Paper Sales Company, Inc., a New York Corporation now dissolved, and International Power and Paper Company of Newfoundland, Limited, the stock of which was at that time owned by Canadian, sells approximately 85% of its newsprint to Sales. Some of the provisions of this "Allocation Plan" contract are in part substantially as follows:

Paragraph 4, subdivision 3: "No participating mill will, without the consent of the Sales Company, install or allow to be installed any newsprint machine in addition to the number of such machines now installed."

Paragraph 7 provides for the sale by the participating mills to Sales for a specific gross profit to the Sales Company per ton; Paragraph 11, "So long as this Agreement is in operation, the International Company shall not part with the control of the Sales Company." Although this contract has expired all three companies continue to operate under it. Sales in turn sells the newsprint to customers in the United States, principally publishers and has at present about 450 contracts for the sale of newsprint in the United States. Sales has representatives in the United States who keep in touch with United States purchasers. Sales notifies Canadian of the needs of its customers and delivery on cars by Canadian is made at the mill by employees of Canadian acting as agents of Sales under written agreements of agency, dated November 11, 1938. Although Sales makes its contracts with United States customers F.O.B. the mill, Canadian pays the freight to the customer in each instance and bills Sales for the price plus freight. In the case of some of the newsprint shipped by water [only about 7% of the total sales to United States customers], Sales undertakes to arrange at its own expense for warehousing the newsprint in public warehouses in the United States. At present Sales has space in warehouses located in New Orleans, Jacksonville and Boston. It further appears in connection with warehousing newsprint that the bills for the space and stevedoring are paid by Canadian where the newsprint is warehoused in the States. Canadian pays the premium on insurance covering newsprint warehoused in the United States. There are no invoices by Canadian to Sales, and the employees of Canadian prepare the shipping mainfests, bills of lading, and pro forma invoices for customs purposes. Sales receive a $1 per ton gross profit.

Sales has 43 employees in the United States and up until April 23, 1947, Sales was authorized to do business in the State of New York.

### Activities of Common Officers.

The affidavit of Mr. Hinman, President of International and Canadian, states that

International and Canadian are operated as distinct and separate corporate entities; that one does not act as agent for the other. He further states that he spends only about two months of each year on matters pertaining to Canadian and that time is generally spent in Canada. The affidavit further sets forth that the management of Canadian, with the exception of certain major matters of policy which he handles, is left to Canadian's General Manager and Vice-President and his assistants, all residents of Canada. He states that he has never solicited while in New York business or customers for either Canadian or Sales and that when prospective United States purchasers of newsprint inquired, he refers them to Mr. Doane who is President of Sales. The record shows that Mr. Hinman here in New York advises by telephone, correspondence or by personal visits, Canadian's General Manager on major policies. In a questionnaire submitted by the Anti-Trust Division of the Department of Justice to International and Canadian, the government asked—

"(6) Please furnish details of the Canadian International Paper Company 'major matters' and 'major questions of policy' on which Mr. Hinman is consulted while he is in the United States."

The answer in part was—

"The greater portion compromise matters of policy concerning the sale of the company's products in the United States and other world markets, on which Mr. Doane and Mr. F. G. Robinson consult him."

These consultations apparently took place in the 42nd Street office and which is listed only as the office of International and Sales but the expense of maintaining it is shared by Canadian.

Although Mr. Hurlbut, Vice-President of Canadian and International, and up to April 17, 1947, Vice-President of Sales, states that his duties as Vice-President of Canadian are very few, he is nevertheless consulted in New York and renders advice in New York as to the sale of newsprint in overseas markets. Since International does not manufacture any newsprint these activities were either for Sales or Canadian.

However, under the "Allocation Plan" Canadian continued to sell directly to customers not in the United States. It therefore appears that these activities were purely Canadian. In his affidavit Mr. Hurlbut states that while he was a Vice-President of Sales he negotiated and discussed with United States purchasers the renewal of newsprint contracts. In June, 1946 he also, as Vice-President of Canadian, negotiated and signed a contract here in New York for the sale of a certain timber tract located in Nova Scotia. In 1945 as Vice-President of Canadian he signed a bank loan from the Chase National Bank of New York in New York. In previous years he likewise acted for Canadian in New York. In 1944 he arranged for a new newsprint contract with the New Orleans Item, New Orleans Times-Picayne; in 1941 a newsprint contract with the Perth Amboy Evening News; in 1944–45 he negotiated for the sale of the stock of the Spartanburg-Herald-Journal Publishing Company to the Greenville News-Piedmont and at the same time negotiated a long term newsprint contract; in 1947 he negotiated a contract for the New Bedford Standard Times in New York and its subsidiary The Cape Cod Standard Times; in March, 1947, he negotiated for the extension of a debenture of the Chicago Times owned by International and at the same time signed a newsprint contract; in 1945 he negotiated for the cancellation of one contract and the execution of a new one with "This Week"; in 1946 he arranged for a contract with News Syndicate Co., Inc., here in New York; in 1944 he negotiated for newsprint contracts with Hearst Corporation and Hearst Consolidated Publications, Inc.; in 1946 he participated in the modification of the above Hearst contracts; in 1944–45 he negotiated for the sale of stock of the Record Publishing Co., owned by International.

The purchaser entered into a twenty year newsprint contract. He negotiated contracts for the sale of a yearly average of 120,000 tons of newsprint. All or substantially all of these newsprint contracts are long term contracts involving substantial sums of money. All or substantially all of these negotiations took place in the New York office.

Mr. Weaver, Vice-President of both Canadian and International, states that in his 42nd Street office he devotes most of his time to International affairs. He does have telephone contact with the General Manager of Canadian and he did negotiate in New York bank loans for Canadian from the Chase National Bank.

Mr. Volk, Treasurer of International and Canadian, states that although he has the title of Treasurer of Canadian he devotes all his time to matters of International, and a Mr. Monge, Assistant Treasurer of Canadian, actually handles the affairs of Canadian. He does state that from his office in New York he keeps in touch with Mr. Monge on various financial matters but says that when Mr. Monge seeks his advice it is more because he was Mr. Monge's predecessor in office rather than because he is Treasurer of Canadian.

Mr. Doane, who is Vice-President and Assistant General Manager of Canadian in charge of the sale of newsprint, is also President of Sales, and hence the main cog in the sale of newsprint by Canadian and the purchase of newsprint by Sales as well as the main cog in the subsequent sale by Sales to purchasers of newsprint. He therefore, as an individual, has control of the sale of newsprint from the first sale by Canadian to the final sale to the customer allegedly by Sales. The record shows that as late as May 10, 1947 he was listed on the building directory of 220 East 42nd Street. The record also shows that he visited Sales' offices in Atlanta, Chicago, and Boston, discussed the revision and extension of Sales contracts in the United States, general business conditions in the United States and world markets, the price of newsprint, operating conditions at Canadian mills, trends in the publishing business and negotiation of a contract in England. Since June, 1946 he visited the United States two or three times a month spending several days on each visit. This time was generally spent in New York. He carried on these various discussions with Mr. Hinman and Mr. Hurlbut. He also had discussions with numerous United States newspaper publishers on their requirements and renewal of their contracts for newsprint.

Mr. Crooker, a Vice-President of Canadian and Sales, likewise was listed in the building directory of 220 East 42nd Street as late as May 10, 1947, and spent considerable time in New York and other places in the United States, discussing and negotiating for the sale of newsprint.

All of these officers in their affidavits state that although they may be officers in two or more of the companies their services were really restricted to one company. They also attempt to segregate their activities to show that while working here in New York their activities were solely for International and they did not exercise the power of their official capacities for Canadian while here in New York. Although this segregation may be possible subjectively, the overall effect of the activities of these officers is to benefit all of the companies for which they are officers.

### Other Activities of the Three Companies.

International and Sales both maintained the same office address in New York. International and Sales are both served in New York by the same telephone truck line and it is the practice of the telephone operators to keep this line open on calls to Montreal so that anyone in one office desiring to speak with anyone in the other may do so.

Both Canadian and Sales maintain substantial bank accounts in New York City at the Chase National Bank. Canadian has two accounts in the Chase Canadian Bank in New York; one a "Special Account" which is not very active; and the other a "Montreal Division Account" which has had balances running as high as $5,000,000 with an average of 123 withdrawals a month from 1945 to 1947. On December 31, 1946, Canadian on its balance sheet had $5,540,906.53 cash which included $2,899,720.13 United States funds. Its Chase National Bank statement for December 31, 1946, shows a balance of $2,917,906.54—more than 50% of its total cash in New York City.

Although Canadian has no listed office in the United States, Mr. Hinman, President of Canadian and of International, Mr. Hurlbut and Mr. Weaver, Vice-President

of Canadian and of International, Mr. Volk, Treasurer of Canadian and International, make their offices and spend a majority of their working time at 220 East 42nd Street, and Canadian shares with International the expenses of maintaining this office, including salaries and expenses of officers, employees, rent, telephone, the expenses being prorated between International and Canadian on the basis of tonnage produced. Mr. Weaver and Mr. Volk are authorized to sign cheques on Canadian account with the Chase Bank, as are Mr. Storm and Mr. Hanway, both employed in the 42nd Street office. Mr. Storm is Assistant Treasurer of International and until December 27, 1946 was Assistant Treasurer of Canadian. Mr. Hanway is Secretary of International and until December 27, 1946 was also Assistant Secretary of Canadian and Sales.

Canadian's Motion to Quash Subpoena.

■ Canadian's position is that insofar as its motion is concerned the sole question is whether it is found doing business in the Southern District of New York. Canadian does not contend that the person served was an improper person to be served as a responsible representative of Canadian for that purpose. Canadian is found here if it is doing business here or has an agent who is doing business here. United States v. United States Alkali Export Association et al.,[1] unreported opinion of Judge Leibell, dated July 16, 1946; Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Jeffrey-Nicholas Motor Co. v. Hupp Motor Car Corporation, 1 Cir., 46 F.2d 623; United States v. Aluminum Co. of America, D.C., 20 F.Supp. 13.

■■ Whether or not a corporation is doing business within a particular jurisdiction so as to subject itself to the court's jurisdiction depends upon the facts of each case. St. Louis Southwestern Ry. Co. of Texas v. Alexander, 227 U.S. 218, 33 S.Ct. 245, 57 L.Ed. 486; International Harvester Co. of America v. Commonwealth of Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479; Green v. Chicago B. & Q. R. Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916;

People's Tobacco Co. Ltd. v. American Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L. Ed. 587, Ann.Cas.1918C, 537. The determination is arrived at not by weighing single acts alone but by weighing their cumulative effect.

■ The only method of ascertaining whether Canadian is found here, is from the activities of those who are authorized to act for it. International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057; United States v. United States Alkali Export Association, supra.

Canadian asserts that it does not maintain an office here. However, it shares the expenses of the New York office including rent, salary of officers and employees, telephone and telegraph charges. It therefore appears that regardless of what name appears on the door, and regardless of what company the officers and employees are alleged to be employed by, Canadian does pay rent for office facilities here as well as the salaries of employees to man it.

The salaries of the officers of Canadian and International in New York are also shared by the two companies. If the contention of these officers be accepted, namely that Canadian and International are operated as separate corporate entities, the conclusion is inescapable that these officers, who spend the greater part of their time in New York, are rendering actual and valuable services to Canadian, or else Canadian would not be charged for nor pay them.

Canadian, through its President Mr. Hinman and Vice-Presidents Weaver and Hurlbut, contend that it does not sell to customers here but that Sales, a separate organization sells to customers here. But it appears in the record that Mr. Hinman decides here in New York the major matters of policy of Canadian which include the sale of Canadian's products in the United States. Mr Hurlbut was at the time of the service of the subpoena Vice-President of the International, Sales and Canadian. As previously set forth he carried on a continuous and substantial number of negotiations for the sale of newsprint. These contracts were long term contracts and no

---

[1] No opinion for publication.

1020

doubt involved substantial profits to Canadian. He states he performed these services in various capacities, one time as Vice-President of the International; another as Vice-President of Canadian, and another as Vice-President of Sales. As the court stated above this segregation may be possible, retrospectively but to the purchaser dealing with Mr. Hurlbut such segregation would be very difficult. Mr. Hurlbut would one moment be discussing either as Vice-President of Canadian or Sales the quantity and quality of newsprint; the next he would be Vice-President of Sales asking himself as Vice-President of Canadian for the allocation of the newsprint to Sales so that he as Vice-President of Sales may consummate the sale.

Mr. Doane is in a similar key position for as President of Sales or Vice-President of Canadian he would discuss with the purchaser the amount and quality of · newsprint desired. He would then seek himself as Vice-President of Canadian in charge of the sale of newsprint for Canadian to sell to himself as President of Sales the amount desired so he may consummate the sale with the purchaser. In what capacity either he, Mr. Hinman or Mr. Hurlbut were acting when they consulted each other is something of a puzzle but reasonable inferences may be drawn from the results.

■ The record clearly shows that Canadian pays rent for an office here and the salaries of employees to maintain it; it maintains as active and substantial bank account here; it ships newsprint into this district; its president, two vice-presidents and treasurer are present here and Canadian is charged with its proportionate share of the salaries paid to these officers for services which they assert are rendered separately and distinctly for services rendered to the other companies; the officers of Canadian decide major issues of policy here and negotiate long term newsprint contracts here; the officers residing in Canada consult with its head officers who are here; its activities here are systematic, continuous and substantial. I think that the activities of Canadian clearly indicate that it was doing business and is "found" within the Southern District of New York and amen-

able to process here. See International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057; People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587, Ann.Cas.1918C, 537; International Harvester Co. of America v. Commonwealth of Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479; Frene v. Louisville Cement Co., 77 U.S.App.D.C. 129, 134 F.2d 511, 146 A.L.R. 926; United States v. United States Alkali Export Association,[1] unreported opinion by Judge Leibell, Southern District of New York, July 16, 1946; Snyder v. J. G. White Engineering Corporation, D.C., 60 F.Supp. 789; United States v. Aluminum Co. of America, D.C., 20 F.Supp. 13.

■ The officers of Canadian subpoenaed contend that they do not have control of the books and records of Canadian since a quorum of the Board of Directors of Canadian, all residents of Canada, passed a resolution in Montreal on December 27, 1946 to the effect that the records of Canadian shall be maintained in the custody of the board of directors, should not be shown to any outside person, and should in no case be allowed to be taken outside of Canada. This resolution was reaffirmed on April 17, 1947. But the subpoena is directed to the corporation, which is represented and acts through its officers and directors and they seek to withhold and to retain custody of the papers which belong to the corporation not as individuals, which they would have no right to do, but in their capacity as officials of the corporation and for the corporation. The papers are so far as appears now in the possession of the corporation. The corporation may not evade complying with the subpoena by a resolution of this character.

■ The fact that a corporation's records and documents are physically located beyond the confines of the United States does not excuse it from producing them if they are in its possession and the court has jurisdiction of the corporation. The test is control—not location of the records. In re Harris, D.C., 27 F.Supp. 480; In re Iron Clad Mfg. Co., 2 Cir., 201 F. 66.

---

[1] No opinion for publication.

Canadian's motion to quash the service of the subpoena is accordingly denied. Settle order on notice.

### Sales Presence Here.

Sales continuously maintains six offices in the United States; New York City, Boston, Cleveland, Chicago, Pittsburg and Atlanta. It employees forty-three salaried employees here, who say they do not solicit orders but receive from customers in various sections of this country requests for renewal of contracts; also the customers' monthly specifications under existing contracts and forward these to Montreal. Its principal officers do carry on continuously and systematically negotiations here with officers of International and Canadian and with customers. It is listed in the telephone directory at its New York office in 42nd Street and its President, Mr. Doane, and its Vice-President Mr. Crooker were, until May 20, 1947 listed in the directory of the 42nd Street building. It has a substantial bank account in New York and accounts in two other American cities. It is continuously shipping large quantities of newsprint to customers in this district upon orders forwarded to them by their employees here.

Since August 16, 1938, and at the time the subpoenas were served on International and Canadian, Sales had on file with the Secretary of the State of New York, a certificate authorizing it to do business here and designating "the secretary of state as its agent upon whom all process in any action or proceedings against it may be served within this state." New York General Corporation Law, § 210. But soon after the subpoenas were served on International and Canadian, Sales, on April 23, 1947, filed a certificate of surrender of authority to do business here pursuant to Section 216 of the General Corporation Law of New York.

Subsequently on May 22, 1947, the subpoena was served on the Deputy Secretary of State of New York as agent for Sales, pursuant to Section 217 of the General Corporation Law. Sales, when it filed its certificate of surrender of authority, consented as it had to under Section 216 of the New York General Corporation Law "that pro-

cess against it in an action or proceeding upon any liability or obligation incurred within this state before the filing of the certificate of surrender of authority, after the filing thereof, may be served upon the secretary of state."

Sales contends nevertheless that this service is bad because a suit by the United States government for alleged violation of the Sherman Anti-Trust Act is not an action or proceeding "upon any liability or obligation."

■ I think that a proceeding brought against a defendant for an alleged previous violation of the Sherman Anti-Trust Act is an action or proceeding "upon any liability or obligation" within the meaning of Section 216. People v. Bankers' Capital Corporation, 137 Misc. 293, 241 N.Y.S. 693. Its liability to the United States both civil and criminal, if violations of the Sherman Act occurred, had become fixed. Its contractual obligations of submission to personal jurisdiction remained. Neirbo Co. v. Bethlehem Shipbuilding Corporation, 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, 128 A.L.R. 1437; Washington v. Superior Court, 289 U.S. 361, 53 S.Ct. 624, 77 L.Ed. 1256, 89 A.L.R. 653; Giusti v. Phrotechnic Industries, 9 Cir., 156 F.2d 351; American Blower Corporation v. B. F. Sturtevant Co., D.C., 61 F.Supp. 756.

■ Sales' second objection is that since a subpoena duces tecum necessitates that the party have control of the books and records, it is not a process which can be served on the Secretary of State. The answer to this seems to me to be that it is not the Secretary of State who is to respond; it is the corporation; he is merely the vehicle for reaching the corporation. Moreover the designation includes "any" or "all" process.

It therefore appears that Sales is both within the jurisdiction and was properly served.

Its motion to vacate the subpoena is accordingly denied. Settle order on notice.

### Grand Jury Presentment in re International.

In view of the above it is unnecessary at the present time, at least, to consider the

presentment of the Grand Jury regarding the failure of the International Paper Company to produce the papers and records of Canadian and of Sales.

The scope and volume of the records and documents called for under the government subpoenas seem so sweeping as to be unreasonable and oppressive and to call for modification. It is suggested that counsel endeavor to agree upon modifications. If any items remain upon which no agreement is reached, counsel may appear before me for argument as to those items at two o'clock, July 24th, in Courtroom 1305. If counsel desire to submit a memorandum regarding them, they may do so in advance of the hearing.