In re URANIUM ANTITRUST LITIGATION.

WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff,

v.

RIO ALGOM LIMITED, Rio Algom Corporation, Rio Tinto Zinc Corporation Limited, RTZ Services Limited, Rio Tinto Zinc Corporation, Conzinc Rio Tinto of Australia Limited, Mary Kathleen Uranium Limited, Pancontinental Mining Limited, Queensland Mines Limited, Nuclear Fuels Corporation, Anglo-American Corporation of South Africa, Limited, Engelhard Minerals and Chemicals Corporation, Denison Mines, Limited, Denison Mines (U.S.) Incorporated, Noranda Mines Limited, Gulf Oil Corporation, Gulf Minerals Canada Limited, Kerr-McGee Corporation, the Anaconda Company, Getty Oil Company, Utah International Inc., Phelps Dodge Corporation, Western Nuclear, Inc., Homestake Mining Company, Atlas Corporation, Reserve Oil and Minerals Corporation, United Nuclear Corporation, Federal Resources Corporation, and Pioneer Nuclear, Inc., Defendants.

In re TENNESSEE VALLEY AUTHORITY URANIUM ANTITRUST LITIGATION.

TENNESSEE VALLEY AUTHORITY, Plaintiff,

v.

RIO ALGOM CORPORATION, Defendant.

TENNESSEE VALLEY AUTHORITY, Plaintiff,

v.

RIO ALGOM LIMITED, Rio Tinto Zinc Corporation Limited, RTZ Services Limited, Gulf Minerals Canada Limited, Gulf Oil Corporation, Uranerz Canada Limited, Noranda Mines Limited, and Denison Mines Limited, Defendants.

TENNESSEE VALLEY AUTHORITY,
Plaintiff,

v.

URANGESELLSCHAFT mbH & CO., Uranex, Engelhard Minerals & Chemicals Corporation, Nuclear Fuels Corporation of South Africa (Proprietary) Limited, Defendants.

Nos. 76 C 3830, 78 C 3233, 78 C 3243 and 78 C 3280.
MDL 342, MDL 342–A.

United States District Court,
N. D. Illinois, E. D.

Nov. 7, 1979.

Donovan, Leisure, Newton & Irvine, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, Freeman, Rothe, Freeman & Salzman, Chicago, Ill., Westinghouse Electric Corp., Raymond Scannell, Pittsburgh, Pa., for Westinghouse.

Arter & Hadden, Cleveland, Ohio, Jeffrey Neal Cole, Winston & Strawn, Chicago, Ill., Simpson, Thacher & Bartlett, New York City, for Atlas.

Schiff, Hardin & Waite, Chicago, Ill., for Anaconda Co.

Peterson, Ross, Schloerb & Seidel, Chicago, Ill., Mudge, Rose, Guthrie & Alexander, New York City, for Denison Mines, Inc.

Cahill, Gordon & Reindel, New York City, Altheimer & Gray, Chicago, Ill., for Engelhard.

Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, Lord, Bissell & Brook, Chicago, Ill., for Federal Resources Corp.

McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., McDermott, Will & Emery, Chicago, Ill., for Homestake.

Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for Kerr-McGee.

Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Noranda.

Debevoise, Plimpton, Lyons & Gates, New York City, for Phelps & Western.

Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Pioneer.

McConnell & Campbell, Chicago, Ill., for Reserve.

O'Melveny & Myers, Los Angeles, Cal., Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for RTZ.

Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., Bigbee, Stephenson, Carpenter & Crout, Santa Fe, N. M., for United.

Mayer, Brown & Platt, Chicago, Ill., for Utah.

Jenner & Block, Chicago, Ill., for Rio.

Arnold & Porter, Washington, D. C., for Urangesellschaft.

Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, Karon, Morrison & Savikas, Chicago, Ill., for Uranerz.

Weil, Gotshal & Manges, New York City, for Uranex.

Keck, Cushman, Mahin & Cate, Chicago, Ill., Howrey & Simon, Washington, D. C., Latham & Watkins, Los Angeles, Cal., Davis, Graham & Stubbs, Denver, Colo., for Gulf.

Burditt & Calkins, Chicago, Ill., Overton, Lyman & Prince, Los Angeles, Cal., for Getty.

Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for British Government.

## MEMORANDUM DECISION *

MARSHALL, District Judge.

On February 27, 1979, we entered Joint Pretrial Order No. 5 in an effort to narrow and ripen the issues surrounding the parties' discovery demands for documents located in foreign countries. We ordered that, by March 28, 1979, all parties should either comply with outstanding discovery demands for "foreign documents" or file restated objections to the production of such documents, including specific and particularized objections to demands for any such documents whose production was said to be forbidden by foreign law. The term "foreign documents" was defined to include all documents whose disclosure was in any way affected by foreign law.

The responses of the parties were varied. Plaintiffs Westinghouse Electric Corporation (Westinghouse) and the Tennessee Valley Authority (TVA) raised no foreign law objections and stated that they either had no foreign documents or were producing all of them. Of the twenty non-defaulting active defendants in the Westinghouse action, six apparently have no foreign documents not previously produced, since they neither produced documents nor stated objections.[1] Two other defendants, Kerr-McGee Corporation and the Anaconda Company, appear to have now produced all responsive foreign documents. Two more defendants, Western Nuclear, Inc. and Phelps Dodge Corporation, were seemingly able to comply with all material document demands. They invoked Australian nondisclosure legislation but frankly summarized the contents of the three Australian documents in such a manner as to convince Westinghouse that it does not need the documents. Ten other defendants have raised foreign law objections and have withheld foreign documents. Those defendants are Rio Algom Corporation (Rio U.S.), Engelhard Minerals and Chemicals Corporation (Engelhard), Denison Mines, Ltd. (Denison Canada), Denison Mines, Inc. (Denison U.S.), Gulf Oil Corporation (Gulf), Gulf Minerals Canada Limited (GMCL), Getty Oil Company (Getty), Utah International, Inc. (Utah), Noranda Mines, Ltd. (Noranda), and Federal Resources Corporation (Federal). In the three TVA actions, in which eight of the thirteen named defendants have appeared, seven of the active defendants have invoked foreign nondisclosure laws as a bar to production.[2] Only one of those defendants, Uranerz Can-

---

* We have delayed this ruling in the hope that the question here decided might be amicably resolved among the parties to these actions and the foreign governments involved (particularly Canada and Australia). *See*, Letter of Latham & Watkins to the Prime Minister and Minister of Energy, Mines and Resources of Canada, dated September 12, 1979. But our hope has turned to despair. This litigation must proceed.

1. The six are Rio Tinto Zinc Corporation of America, Homestake Mining Company, Atlas Corporation, Reserve Oil and Minerals Corporation, United Nuclear Corporation, and Pioneer Nuclear, Inc.

2. The eighth TVA defendant, Urangesellschaft mbH & Co., has raised no foreign law objections.

ada Ltd. (Uranerz), is not a defendant in the Westinghouse action.

Westinghouse has moved for production orders pursuant to Rule 37(a), F.R.Civ.P., against the ten non-producing defendants listed above, and TVA has similarly moved against the seven non-producing defendants in its case. The following table connects each defendant with the country whose foreign law is invoked as a bar to production. Defendants who are named in both the Westinghouse and TVA motions are identified by an asterisk (*):

| Australia | Canada |
| --- | --- |
| Engelhard * | Denison Canada * |
| Getty | Denison U.S. * |
| Noranda * | Federal |
| Utah | Rio U.S. * |
| **South Africa** | Uranerz |
| | Noranda * |
| Engelhard * | Gulf * |
| **Switzerland** | GMCL * |
| Gulf * | |
| GMCL * | |

Five sets of foreign laws are involved. Three of those are regulations or statutes of Canada, Australia and South Africa which were enacted or modified during the period from 1976 to 1978 for the express purpose of frustrating the jurisdiction of the United States courts over the activities of the alleged international uranium cartel. Those laws generally prohibit the production of any document relating to uranium marketing activities from 1972 through 1975 and also prohibit communications that would result in the disclosure of the contents of such documents. The fourth statute is the Ontario Business Records Protection Act, which was enacted in Canada in 1947. That Act forbids the production of any business records requested by a foreign tribunal if a provincial court issues an order to that effect. Because no such order has been sought or issued to date, this Act has little or no applicability here. The final statutes are Articles 162 and 273 of the Swiss Penal Code, which prohibit the disclosure of a "business or manufacturing secret." Because a violation can be avoided if a person with a secrecy interest in some matter consents to its disclosure, and because Gulf and GMCL expect to secure all necessary consents within a short span of time, the Swiss statutes also have limited applicability here. All of these statutes impose criminal penalties for their violation, including fines and imprisonment.

In addition to plaintiffs' motions to compel, three of the defendants—Getty, Gulf and Utah—have filed motions to compel Westinghouse to produce documents located in Australia, Canada and South Africa. Because Westinghouse has raised no foreign law objections to the production of those documents, these defendants' complaint is that Westinghouse's purportedly complete production of documents is in fact only a partial one. This contention rests mainly on inferences drawn from an affidavit by one of Westinghouse's attorneys, James E. Daniels.

The Daniels affidavit states that Westinghouse documents responsive to defendants' document requests are located in Canada, Australia and South Africa, that the nondisclosure laws of those countries have not deterred Westinghouse's compliance with those requests, and that, based upon his own knowledge and on consultation with others, Daniels is satisfied that copies of all responsive documents in those countries, together with any handwritten and margin notes, are now available for inspection at Westinghouse's Pittsburgh offices. Defendants claim these statements fail to meet the requirements of paragraph 5 of Joint Pretrial Order No. 5, which requires Westinghouse to specify "the procedures it followed in ascertaining that identical copies of such foreign documents, including handwritten notations, marginalia and attachments, have been produced from files maintained in the United States . . . ." In addition, they contend that Westinghouse has ignored the additional requirement that a party must identify the foreign documents that were not produced if copies of those originals were produced from its U.S. files or state the circumstances that prevent such identification. In essence, then, these defendants suspect that Westinghouse's U.S. files are less complete than

those in foreign countries, want more complete information to determine whether this is so, and then want access to any additional documents which are discovered.

Plaintiffs' and defendants' motions to compel thus rest on wholly different theories. With plaintiffs' motions, the main issue is whether defendants should be ordered to produce withheld documents despite the prohibitions of foreign nondisclosure laws. With defendants' motions, the main issue is whether Westinghouse has withheld foreign documents, and that question turns on the sufficiency of the Daniels affidavit. Assuming such documents have been withheld, Westinghouse seems to have raised no objection to their disclosure. Because plaintiffs' motions raise the more complex issues and occupy the bulk of the voluminous papers which have been submitted to us, we shall discuss them first.

The parties have offered differing views on the proper standards to be applied in deciding whether to issue a production order for documents located in a country which prohibits their removal or disclosure. Plaintiffs argue that Rule 37 requires a bifurcated two-step procedure for compelling production and imposing sanctions. They contend that the question of whether a discovery order should issue is solely a matter of American law; foreign nondisclosure laws are only relevant in deciding whether sanctions should be imposed for non-compliance. Defendants argue that we should instead use a balancing test to consider all circumstances, including foreign law, before entering an order compelling discovery. We take a middle course between these opposing positions, finding that a number of factors must be considered before issuing a production order, but that the inquiry is not as comprehensive as defendants suggest.

■ At the outset, we should identify the type of jurisdiction exercised by a court in issuing an order to produce foreign documents. In the field of foreign relations law, two types of jurisdiction have been defined. Prescriptive jurisdiction refers to the capacity of a state under international law to make a rule of law. It is exemplified by the enactment of the Federal Rules of Civil Procedure, e. g., Rule 37. Enforcement jurisdiction, on the other hand, refers to the capacity of a state under international law to enforce a rule of law. When a court enters an order compelling production of documents under Rule 37, it exercises its enforcement jurisdiction. *Restatement, Second, Foreign Relations Law of the United States*, § 6 (1965); Onkelinx, *Conflict of International Jurisdiction: Ordering the Production of Documents in Violation of the Law of the Situs*, 64 Nw.L.Rev. 487, 495 (1969). The jurisdiction of American courts is unquestioned when they order their own nationals to produce documents located within this country. But jurisdiction is less certain when American courts order a defendant to produce documents located abroad, especially when the country in which the documents are situated prohibits their disclosure.

■ As a general rule, a court has the power to order a person subject to its jurisdiction to perform an act in another state. *Restatement, Second, Conflict of Laws*, § 53 (1971). There are two preconditions for the exercise of this power. First, the court must have personal jurisdiction over the person. Second, the person must have control over the documents. *United States v. First National City Bank*, 396 F.2d 897, 900–01 (2d Cir. 1968); *In Re Grand Jury Supoenas Duces Tecum Addressed to Canadian International Paper Co.*, 72 F.Supp. 1013 (S.D.N.Y.1947). The location of the documents is irrelevant. 72 F.Supp. at 1020.

■ On the issue of control, there are certain corollary principles which apply to multinational corporations. The test for determining whether an American court can order an American parent corporation to produce the documents of its foreign subsidiary was stated in *In Re Investigation of World Arrangements*, 13 F.R.D. 280, 285 (D.D.C.1952):

[I]f a corporation has power, either directly or indirectly, through another cor-

poration or series of corporations, to elect a majority of the directors of another corporation, such corporation may be deemed a parent corporation and in control of the corporation whose directors it has the power to elect to office.

Thus, for example, if the parent owns more than 50% of the foreign subsidiary's stock, it possesses the necessary control. W. Fugate, *Foreign Commerce and the Antitrust Laws,* 116 (2d ed. 1973).

■ The test is less clear in situations where an order is directed to the American subsidiary of a foreign corporation to produce documents from its head office located abroad. One court has held that a subpoena duces tecum was enforceable if it was served on the subsidiary's offices in the United States, even though the corporation's board of directors had passed a resolution prohibiting the removal of the requested records from Canada and even though all the board members were residents of Canada. *In Re Grand Jury Subpoenas Duces Tecum, supra,* 72 F.Supp. at 1020. The court's reasoning as to how the American officers had control over the withheld documents seems to rest on the theory that it was sufficient that the documents were in the possession of the corporation and that a subpoena had been served on some of its officers. *See* Onkelinx, *supra,* 64 Nw.L.Rev. at 505–06. More helpful guidance can be drawn from *Societe Internationale v. McGranery,* 111 F.Supp. 435, 440–42 (D.D.C.1953), in which the court held that plaintiff, a Swiss corporation, had control over the papers of its Swiss-based bank, H. Sturzenegger & Cie.[3] The court attached significance to the fact that Sturzenegger was a director and officer of plaintiff and was "perhaps" a dominant personality in plaintiff's affairs. After an extensive examination of the corporate affiliations of

the two partners, the court concluded that "[t]hrough the interlocked web of corporate organization, management and finance there runs the thread of a fundamental identity of individuals in the pattern of control." 111 F.Supp. at 442. Thus, the issue of control is more a question of fact than of law, and it rests on a determination of whether the defendant has practical and actual managerial control over, or shares such control with, its affiliate, regardless of the formalities of corporate organization.

■ Once personal jurisdiction over the person and control over the documents by the person are present, a United States court has power to order production of the documents. The existence of a conflicting foreign law which prohibits the disclosure of the requested documents does not prevent the exercise of this power. This proposition has been accepted by both the American Law Institute (*Restatement, Second, Foreign Relations Law of the United States,* § 39[4]), and by the Supreme Court, *Societe Internationale v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). However, American courts should not ignore the fact that such a law exists. When two states, both having jurisdiction, prescribe inconsistent conduct, American courts have developed certain rules of self-restraint governing the appropriate exercise of their power. *United States v. First National City Bank, supra,* 396 F.2d at 901. Because *Societe Internationale* dominates the field and sets forth the pertinent considerations to be weighed when such conflicts arise, we analyze it at length.

The procedural context of the *Societe* case is intricate. A Swiss company brought a civil suit under the Trading with the Enemy Act to recover assets which the United States Government had seized during World War II as enemy-owned proper-

---

**3.** The court's holding on the control issue was accepted both by the Court of Appeals, *Societe Internationale v. Brownell,* 96 U.S.App.D.C. 232, 236, 225 F.2d 532, 536 (D.C.Cir. 1955), and by the Supreme Court, *Societe Internationale v. Rogers,* 357 U.S. 197, 204, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

**4.** Section 39(1) states:
A state having jurisdiction to prescribe or to enforce a rule of law is not precluded from exercising its jurisdiction solely because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct.

ty. The American government challenged plaintiff's claim of ownership and also asserted that plaintiff itself was an "enemy" and hence was barred from recovery under the Act. To prove its defenses, the government moved for an order requiring plaintiff to produce documents held by its bank in Switzerland. The district court granted the motion. Plaintiff then sought to avoid production on the ground that disclosure of the bank records would violate Swiss penal laws and subject it to criminal sanctions. The defendant in turn moved to dismiss the complaint because of plaintiff's noncompliance with the production order.

The district court appointed a special master to consider plaintiff's claims. The master found that there was no evidence of collusion between plaintiff and the Swiss government to evade discovery, and that plaintiff had shown good faith in its efforts to secure waivers from the Swiss government and to comply with the order. The district court accepted these findings, but nevertheless dismissed the complaint with prejudice holding that plaintiff had control over the bank records, that the records "might prove to be a deciding factor in the outcome of this suit" (111 F.Supp. at 443), that Swiss law did not provide an adequate excuse for noncompliance, and that the court in these circumstances had the power to dismiss the complaint. Although plaintiff was given a grace period to continue its efforts to secure waivers from the Swiss government, and although it produced more than 190,000 documents over the next three years, plaintiff ultimately failed to achieve full compliance. Consequently, the district court directed a final dismissal of the action. The Court of Appeals affirmed.

On certiorari, the Supreme Court affirmed the issuance of the production order, but reversed the dismissal of the action. It is the first half of the Court's holding that is of primary concern to us here.

In deciding that the production order was justified, the Court first accepted the district court's finding that, apart from the effect of Swiss law, the documents were within plaintiff's control and possession. It

then discussed the question of whether Swiss law barred the conclusion that plaintiff had "control" of the documents within the meaning of the Federal Rules of Civil Procedure governing discovery orders. The Court decided that Swiss laws did not create an insuperable obstacle to issuance of a production order.

The Court identified three salient factors which influenced its decision. First, in enacting the statute which formed the basis for plaintiff's action, Congress had expressed a "deep concern" with reaching property held by corporations whose intricate financial structure disguised their ties to enemy interests. The Court stated that a failure to order the production of documents illuminating plaintiff's financial background would frustrate this Congressional policy. We infer that the Court would accept the obverse proposition that a court should generally order production to effectuate strong Congressional policies. In addition, because the Court gave no hint that the disclosure policies of the American statute should be balanced against the secrecy policies of the Swiss law, it appears that the only pertinent inquiry is the strength of the American interests. Second, the Court noted that the requested records were "vital" to a determination of the pivotal statutory inquiry, namely whether plaintiff was the captive of enemy interests. The Court thus suggested that the normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence does not apply, and should be replaced by the higher standard of whether the requested documents are crucial to the resolution of a key issue in the litigation. Third, in apparent reliance on plaintiff's status as a Swiss national invoking the prohibitions of its own country's penal laws, the Court stated that plaintiff was in a favorable position to secure a waiver of those laws from its government or to explore alternative procedures for achieving compliance. The opinion thus suggests that the greater the chances for flexibility in a country's application of its nondisclosure laws, the greater the likelihood that a production order

should issue. In conclusion, the Court stated that "United States courts should be free to require [persons such as plaintiff] . . to make all such efforts [at compliance] to the maximum of their ability . . ." 357 U.S. at 205, 78 S.Ct. at 1092.

In the next paragraph, however, the Court explicitly confined its ruling to the case before it, thus weakening the precedential value of its three-pronged analytical framework. The propriety of issuing a production order in other cases was said to depend not only on those three factors, but also on the "exigencies of particular litigation" and "the circumstances of a given case." 357 U.S. at 206, 78 S.Ct. at 1092. These circumstances and exigencies were not defined with any particularity.

Although the Court by this language seemingly endorsed a completely open-ended approach for deciding future cases, the overall tenor of the opinion and several additional comments lead us to conclude that the Court envisioned some limits on its inquiry. First, in summarizing its holding that the district court properly issued the production order, the Court mentioned only two interests which were to be factored into the decisionmaking process: a) the requirements of the procedural rule authorizing production orders, and b) the policies underlying the law which formed the basis for the action. 357 U.S. at 206, 78 S.Ct. 1087. The first of those interests encompasses the questions of defendant's control over the documents and plaintiff's need for them. The other is confined to the importance of the policies behind the American law. Second, the next section of the opinion contains language which reserves certain factors for consideration solely at the sanctions phase of the enforcement process. In that section, the Court explored the source of a federal court's power to dismiss a complaint because of noncompliance with a production order, and decided that it rested solely on Rule 37, F.R.Civ.P. The Court then found that a district court's Rule 37 power is invoked when a party "refuses to obey" such an order, and that refusal occurs whenever a party fails to comply with an order, regardless of its reasons for noncom-

pliance. This analysis is followed by this sentence:

Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance and are relevant *only* to the path which the District Court might follow in dealing with [a party's] failure to comply. 357 U.S. at 208, 78 S.Ct. at 1094. (Emphasis supplied.)

Although this sentence does not explicitly remove defendant's reasons for noncompliance from consideration at the order-making stage of the proceedings, it impliedly has that effect, because we are told such reasons are relevant *only* to the question of appropriate sanctions.

This conclusion is confirmed by the third section of the *Societe.* opinion, in which the Court examined whether plaintiff's stated reasons for noncompliance were adequate to prevent dismissal of its complaint under Rule 37. The Court first determined that plaintiff "had in good faith made diligent efforts to execute the production order," then found that those efforts fell short of full compliance, and then analyzed the shortfall to see whether it was caused by plaintiff's "inability fostered neither by its own conduct nor by circumstances within its control."

In defining acceptable forms of inability, the Court discussed a number of issues that the parties in the present case have attempted to raise prematurely at the order-making stage. One such issue is whether defendants "deliberately courted legal impediments" in a foreign country to evade discovery, such as by requesting a foreign government to adopt a nondisclosure law and then shipping its records to that jurisdiction. Another is the severity of the sanctions imposed for violation of the non-disclosure law and the resulting hardship to defendants. In this vein, the Court noted that "fear of criminal prosecution constitutes a weighty excuse for nonproduction . . ." A further issue concerns the scope and applicability of the foreign laws, since a refusal to produce which rests on an overbroad and unjustified interpretation of

the foreign laws will not be honored here. On this question the Supreme Court stated that "the very fact of compliance by disclosure of banking records will itself constitute the initial violation of Swiss laws."

The wisdom of deferring consideration of these factors until the sanctions phase of the proceedings is clear. In the present case, each defendant seeks to differentiate itself from its co-defendants on the basis of a variety of factors, including the volume of the documents it is withholding, the extent of its culpability in securing passage of the foreign laws, its good faith in seeking to comply with document requests, the amount of hardship it might suffer by disclosure, and the breadth of its interpretation of foreign laws. Each defendant asks for separate treatment and consideration. A decision to grant or withhold a production order under Rule 37(a) does not provide a means for tailoring relief to the individual circumstances of each defendant. On the other hand, Rule 37(b) is flexible and offers a variety of sanctions, if necessary, which the court may incorporate into such orders "as are just."

The Supreme Court in *Societe* recognized the validity of this approach. Although it found that the district court was unjustified in dismissing plaintiff's complaint, it remanded the case with instructions that the district court "possesse[d] wide discretion to proceed in whatever manner it deems most effective." That discretion included options to "explore plans looking towards fuller compliance," and even to "draw [ ] inferences unfavorable to [plaintiff] as to particular events." This language indicates that a production order is only the first step in the process of resolving discovery disputes, and that it should not be prematurely burdened by a comprehensive inquiry into all ramifications of the controversy.

To summarize the preceding discussion, we have concluded that we possess the power to enter an order against defendants under Rule 37(a) compelling them to produce documents located abroad if the particular defendant is within the personal jurisdiction of this court and has control over the requested documents. *Societe* teaches that the decision whether to exercise that power is a discretionary one which is informed by three main factors: 1) the importance of the policies underlying the United States statute which forms the basis for the plaintiffs' claims; 2) the importance of the requested documents in illuminating key elements of the claims; and 3) the degree of flexibility in the foreign nation's application of its nondisclosure laws. Relying on the Court's additional suggestion that each case must depend upon its particular facts, several defendants urge that we consider several other factors that we have not yet discussed. However, in the circumstances of this case, we find that these other factors are of limited or no utility.

Several defendants cite the *Restatement, Second, Foreign Relations Law of the United States*, § 40(a) or rely on broad notions of "international comity" for the proposition that we should balance the vital national interests of the United States and the foreign countries to determine which interests predominate. Aside from the fact that the judiciary has little expertise, or perhaps even authority, to evaluate the economic and social policies of a foreign country, such a balancing test is inherently unworkable in this case. The competing interests here display an irreconcilable conflict on precisely the same plane of national policy. Westinghouse seeks to enforce this nation's antitrust laws against an alleged international marketing arrangement among uranium producers, and to that end has sought documents located in foreign countries where those producers conduct their business. In specific response to this and other related litigation in the American courts, three foreign governments have enacted nondisclosure legislation which is aimed at nullifying the impact of American antitrust legislation by prohibiting access to those same documents. It is simply impossible to judicially "balance" these totally contradictory and mutually negating actions.

All defendants rely on a line of Second Circuit cases which were decided after *Societe* and which suggest that a district court

should not order production if the order would cause a party to violate a foreign law. *First National City Bank v. Internal Revenue Service*, 271 F.2d 616 (2d Cir. 1959); *Ings v. Ferguson*, 282 F.2d 149 (2d Cir. 1960); *Application of Chase Manhattan Bank*, 297 F.2d 611 (2d Cir. 1962). Plaintiffs rely in turn on a Tenth Circuit decision which takes a contrary view. *Arthur Andersen & Co. v. Finesilver*, 546 F.2d 338 (10th Cir. 1976). We believe that the Tenth Circuit decision is more closely in harmony with the principles established in *Societe.*

█ Gulf and Uranerz urge that the production orders sought by plaintiffs are barred by the act of state doctrine because they would interfere with the conduct of our foreign relations by the Executive Branch. However, the act of state doctrine is not applicable here. That doctrine bars an American court from questioning the validity of the act of a foreign sovereign when that act is done within the sovereign's territory. *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Plaintiffs have not challenged the validity of any of the foreign nondisclosure laws which are relied on by defendants. The issue is not whether those laws are valid, but rather, conceding their validity, whether they excuse defendants from complying with a production order.

█ Many defendants ask us to consider communications from foreign governments to the U. S. State Department which have protested the issuance of production orders by American courts in similar circumstances. We believe those communications are relevant to the decision whether to issue a production order only insofar as they indicate the degree of accommodation or adjustment which the foreign government may be willing to make in its nondisclosure laws. We reserve any further consideration of these communications to the hearing on sanctions, if that becomes necessary.

Finally we have on this question—as we have on another question[5]—been benefitted with statements amici curiae from the Governments of Canada, Australia, South Africa and Switzerland. By far the most extensive of these is the Canadian statement which urges that we defer to the critical importance which Canada attaches to its national policies and regulations. But as we have earlier observed a balancing test is inherently unworkable in this case, and were it not we would be hard pressed not to accede to the strong national policy of this country to enforce vigorously its anti-trust laws.

There are two procedural hurdles we must clear before we reach the merits of the various motions to compel. The issues are ones of waiver and collateral estoppel.

█ TVA argues that Uranerz and Noranda have waived certain foreign law objections by failing to raise them in a timely manner. As to Uranerz, we previously ruled on January 29, 1979 that Uranerz, because of its delinquency in asserting objections, had waived all objections to production *except* those objections based on the Canadian nondisclosure laws. We created this exception after learning that many other defendants had raised foreign law objections, that the issue was unusually sensitive and important, and that neither side had moved for a resolution of the issue. In those circumstances, we ruled that it would be unfair to deprive Uranerz of the opportunity to raise the foreign law objection.

Noranda's situation is somewhat different. Noranda initially objected to TVA's document requests on the basis of Canadian nondisclosure laws. However, when it later defined its foreign law objections in accordance with Pretrial Order No. 5, Noranda added a new objection based on Australian law. TVA challenges the Australian law objection as untimely, because it was not raised in response to the document requests and because the pretrial order did not ex-

---

**5.** Here the amici appear in support of the non-defaulting defendants. On the question of the timing of the hearing to prove up damages on the default judgment, which is now before the Court of Appeals, the amici have supported the defaulting defendants.

pressly authorize new objections. We think TVA's interpretation of the pretrial order is too narrow. The order was drafted in response to the delays and difficulties in document production which first surfaced in the Uranerz situation, and was specifically intended to provide the final deadline for particularized foreign law objections to all prior and pending document requests. All objections filed within the time limits of the order are proper.

■■ Rio U.S., Noranda and Uranerz contend that plaintiffs are collaterally estopped from litigating their present motions because the Tenth Circuit decided the same issues adversely to them in *In Re Westinghouse Electric Corporation Uranium Contract Proceedings*, 563 F.2d 992 (10th Cir. 1977). That case was a by-product of the related Virginia contracts litigation, where Westinghouse was sued for breach of its uranium contracts by thirteen utility companies, including TVA. In an effort to prove its defense that the real cause of its inability to perform was a price-fixing conspiracy among uranium producers, Westinghouse served a subpoena on Rio U.S., a non-party, in Utah. The subpoena directed Rio U.S. to produce certain business records. Rio U.S. raised the Canadian nondisclosure laws as a bar to production and moved to quash the subpoena. The district court denied the motion and entered a production order. After Rio U.S. failed to comply, it was adjudged in contempt and was fined $10,000 per day until it complied with the order. The Tenth Circuit reversed, holding that "[a]ll things considered, on the basis of the record before it, the district court in our view abused its discretion in adjudging Rio [U.S.] to be in contempt of court, and in imposing the severe sanction in connection therewith." 563 F.2d at 996.

We do not believe that the court's decision constitutes an estoppel to plaintiffs' present motions. TVA never appeared in the Utah proceedings, and therefore never had a full and fair opportunity to litigate the issues. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Its position as a party plaintiff in the Virginia litigation, in which it was Westinghouse's adversary, gave it no meaningful incentive to intervene in Westinghouse's efforts to secure discovery on Westinghouse's cartel-related defenses. Although Westinghouse did have a full opportunity to litigate the issues, those issues are not the same as those raised here. The only issue on appeal was the propriety of the sanctions imposed for noncompliance, not the validity of the production order. Therefore, that decision offers no conclusive guidance on the issue of whether a production order should issue here. Furthermore, the decision whether to impose sanctions rests on a variety of factors, and those factors have been restructured in this case by Rio U.S.'s status as a party rather than a witness, by the more crucial relevance of the requested documents to plaintiffs' antitrust claims, and by our opportunity to have a much more complete record on Westinghouse's charges of a collusive attempt to evade discovery and of overall bad faith.[6]

We now examine whether all defendants are within the personal jurisdiction of this court and have control over the requested documents, so that we possess the requisite power to issue an order under Rule 37(a) compelling production of their foreign documents. Only Noranda has raised an objection based on lack of *in personam* jurisdiction. Five defendants—Engelhard, Noranda, Denison U.S., Rio U.S. and Uranerz—deny that they control the requested documents.

■■ Noranda has moved to dismiss both the Westinghouse and the TVA actions for lack of personal jurisdiction. Both motions have been deferred pending discovery. No-

---

**6.** Of course, a more complete record is of no consequence for collateral estoppel purposes if Westinghouse could have developed the same facts against Rio U.S. in the earlier litigation. It appears, however, that some additional facts have only recently been made available (e. g. the grand jury documents) or relate to subsequent events (e. g. later efforts to secure waivers from the foreign governments).

randa argues that no production order can be entered until we rule upon the motions. We disagree, because even in the absence of such a ruling, we possess jurisdiction to determine our jurisdiction over the parties. In the exercise of that jurisdiction, we may compel discovery to aid our resolution of the personal jurisdiction issues.

Noranda admits that it has interposed foreign law objections to production of several documents which are directly relevant to its contacts with Illinois: 1) the content of a document regarding the seminar of the Atomic Industrial Forum in Oak Brook, Illinois in 1973, and 2) documents concerning contacts with two Illinois utilities. Noranda seeks to nullify the usefulness of these documents by making self-serving and uncorroborated assurances that they do not establish its contacts with this state. Plaintiffs are not required to accept these assurances, and are entitled to make their own inspection of the documents. *Societe Internationale v. McGranery, supra,* 111 F.Supp. at 442.

Noranda makes the alternative contention that we should limit discovery to those documents relevant to the jurisdictional issues. While we agree with this statement as a general principle, that principle offers little assistance where, as here, the jurisdictional and merits discovery is intertwined. Because the documents withheld pursuant to foreign law are peculiarly likely to impact on both areas, and because any segregation of documents will likely involve the unreviewable discretion of the party segregating and withholding them, we believe an order requiring full production is necessary.

To resolve the issue of whether four defendants control the requested documents, we must delve into the details of their corporate affiliations. Rio U.S. and Denison U.S. are the American subsidiaries of foreign parents, Engelhard is an American parent with foreign subsidiaries, and Noranda is a foreign parent with foreign and domestic subsidiaries.

Engelhard is a Delaware corporation with its principal place of business in New York City. Although it does not mine or produce uranium, it has acted as a sales representative for Nuclear Fuels Corporation of South Africa (Nufcor, a defaulting defendant) in promoting its sales of uranium in North America. In carrying out that function, Engelhard has been assisted by three wholly owned subsidiaries located in Australia and South Africa. Derby and Co. (South Africa) Pty., Ltd. is a South African corporation which is a wholly owned subsidiary of Derby and Co., Ltd. (London), which in turn is a wholly owned subsidiary of Engelhard. Derby-South Africa transmitted information between Nufcor's offices in South Africa and Engelhard's offices in the United States. Philipp Brothers (Australia) Pty., Ltd. is an Australian corporation which is a wholly owned subsidiary of Engelhard. Derby and Co. (Australia) Pty., Ltd. is an Australian corporation which is a wholly owned subsidiary of Derby-London. The Australian subsidiaries have aided Engelhard in its unsuccessful attempt to act as a sales representative for a newly-developing Australian mining company, Queensland Mines, which is also a defaulting defendant. Engelhard states that "it is possible that one or more of these subsidiaries may have within its possession, custody or control documents or information responsive to portions of [plaintiffs'] document requests . . ." Engelhard has refused to produce those documents.

It is clear that Engelhard's total ownership of its Australian and South African subsidiaries gives it effective control over those corporations' documents. Engelhard's only argument to the contrary is that the normal inference of control is rebutted here because Engelhard has no legal right to direct the officers and employees of its foreign subsidiaries to violate the nondisclosure laws of their countries. The Supreme Court specifically rejected that argument in *Societe,* after it weighed the argument in light of the three factors we have identified above. 357 U.S. at 204–06, 78 S.Ct. 1087. We reach the same conclusion, but postpone our analysis for a consolidated discussion of all defendants' arguments on this issue. See pp. 1154–1156 below.

Noranda is a Canadian corporation with its principal place of business in Ontario. Noranda itself does not own uranium or uranium-producing properties and has not sold uranium. However, it owns 43.8% of the common shares of Kerr-Addison Mines, Ltd., a Canadian corporation which has a wholly owned subsidiary called Agnew Lake Mines, Ltd., which in turn owns a 90% interest in a uranium-producing mine in Ontario, Canada. Kerr-Addison's shares are publicly traded on the Toronto Stock Exchange and are owned by more than 11,000 shareholders. While a minority of the directors of Kerr-Addison are also officers of Noranda, Kerr-Addison keeps its own books and records and holds its own corporate meetings separate and apart from any other company. Noranda also has wholly owned subsidiaries that own uranium prospects located in Canada, Australia and the United States. One of these is Noranda Australia, Ltd., which has an interest in undeveloped uranium deposits in Australia. In addition, personnel of Noranda Sales Corporation, Ltd., a wholly owned Canadian subsidiary, have consulted with purchasers or prospective purchasers of uranium at various times in an effort to sell uranium to be produced in the future. These facts, as disclosed by affidavits in support of Noranda's motion to dismiss, reveal that Noranda has control over responsive documents of Noranda Australia and Noranda Sales, but not over those of Kerr-Addison.

The situation with Rio Algom Corporation (Rio U.S.) is much more complex than either Noranda or Engelhard. Rio U.S. is a Delaware corporation with its principal place of business in Moab, Utah, where it owns and operates a uranium mining and milling facility. Rio U.S. is the wholly owned subsidiary of Atlas Alloys, Inc., an Ohio corporation, which in turn is the wholly owned subsidiary of Rio Algom, Ltd. (Rio Canada), a Canadian corporation which mines and sells uranium produced from its Elliott Lake mine in Canada. Rio U.S. has appeared in this action and defended itself, but Rio Canada has defaulted.

Rio U.S. states that it has withheld no documents in its possession, custody and control, including documents from files located in Canada, on the ground that they are affected by foreign law. However, it has declined to produce certain other documents located in Canada because those documents are in the possession, custody and control of its parent once removed, Rio Canada, and because production of those documents would violate Canadian law. Westinghouse has sought to define an overlap or gray area of documents falling between these two statements. Westinghouse argues that Rio U.S. has unjustifiably refused to produce responsive documents concerning its uranium mining, marketing and exploration activities, because even though those documents are located in Canada in the files of Rio Canada's directors, officers and employees, those persons at all pertinent times acted in behalf of Rio U.S. and had responsibility for those uranium activities.

In support of this contention, Westinghouse has submitted extensive evidence that Rio U.S. and Rio Canada have operated as a single functional unit in all aspects of their uranium business. These two corporations have shared an interlocking structure of corporate directors, officers, and executive and administrative personnel who have managed the uranium-related activities of both corporations. The intervening ownership interest of Atlas Alloys is wholly collateral to the managerial unity of the two companies. Numerous officers of Rio U.S. have held dual positions with Rio Canada, enabling them to perform identical uranium-related functions for each corporation. For example, George Albino, in his capacity as principal operating officer of both corporations from 1971 to 1977, exercised direct managerial control over the daily uranium operations of both companies. Nine of Rio U.S.'s current officers and directors have offices at the corporate headquarters of Rio Canada in Toronto, Ontario. In January, 1976, A. G. Lowell, who is a Rio Canada Vice-President, stated that "Rio Algom Corporation is wholly owned by Rio Algom Ltd., and all marketing matters related to

uranium and other mineral products are handled from our Toronto office." Other evidence demonstrates that Rio U.S. and Rio Canada have been treated as a single uranium business not only by themselves, but by other members of the uranium industry and by their ultimate parent, Rio Tinto Zinc Corporation, Ltd.

 From the available evidence of coordinated uranium-related activities, we conclude that there is a strong likelihood that Rio U.S. is withholding responsive documents in the files of Rio Canada personnel who have had and/or continue to have responsibility for Rio U.S.'s mining and marketing of uranium. To defend this withholding, Rio U.S. relies on cases involving a corporation's liability for a related corporation's actions. However, there is a crucial distinction between ability to compel production of documents and liability for a subsidiary's acts. The latter may require Rio U.S. to actually control or manage Rio Canada's business, but the former does not. W. Fugate, *Foreign Commerce and the Antitrust Laws, supra* at 116. It is sufficient that Rio U.S. has, or once had, control over its directors, officers and employees who managed the uranium-related activities of Rio U.S. alone or of both corporations. Rio U.S. must produce all responsive documents held by those employees or former employees, even if those documents have found their way into Rio Canada files. The formalities separating the two corporations cannot be used as a screen to disguise the coordinated nature of their uranium enterprise.

A similar situation may exist with respect to defendant Denison Mines, Inc. (Denison U.S.), but Westinghouse has provided insufficient documentation for us to conclude that Denison U.S. controls withheld documents in the files of its parent defendant Denison Mines, Ltd. (Denison Canada). Denison Canada is a Canadian corporation with its principal place of business in Toronto and engages in the mining, milling and sale of uranium. Denison U.S. is a Delaware corporation with its principal place of business in Denver, Colorado and is a wholly owned subsidiary of Denison Canada. Denison U.S. is and has been engaged in exploration for uranium and other minerals in the United States. Answer, ¶¶ 17, 18. Both corporations have appeared in this action.

Like Rio U.S., Denison U.S. states that it has raised no objections based on foreign law and has produced all documents within its control. Indeed, Denison U.S. allowed plaintiffs to walk through their entire files and select documents without regard to relevancy standards, with the exception of documents covered by the attorney-client privilege or work product immunity. However, Denison U.S. has been silent on the question of whether some of its documents were generated in Canada and have been kept there. Westinghouse suggests that these documents have been and are now held by Denison Canada and that the close managerial connections between the two corporations justify the issuance of an order directing the production of all such documents reflecting management decisions of Denison U.S. But Westinghouse's exhibits on this issue (Nos. 61 and 62) are too scanty to support this inference. Consequently, Westinghouse's motion to compel Denison U.S. to produce documents from the files of its parent Denison Canada must be denied.

Uranerz raises a control issue of a completely different character. Its documents are located primarily in its corporate offices in Canada and West Germany, and Uranerz raises no control objections as to them. But an undisclosed volume of Uranerz documents is currently located in the offices of the Ministry of Energy, Mines and Resources of the Canadian government in Ottawa. Those documents were transferred in November, 1976, after the Canadian government directed Uranerz and other companies to deposit with the Ministry all documents covered by the Canadian nondisclosure laws which had been enacted in September of that year. When Uranerz's American counsel, Mr. Levitt, later asked the Ministry if he could review the documents, he was advised that no American counsel for any company has been permit-

ted to inspect any documents in the Ottawa depository. Levitt was informed that his request would not even be considered unless he could furnish a written opinion that he could not be compelled by any American court to disclose what he had seen. In his view, American law did not provide such an airtight safeguard against disclosure that he could give such assurances. Therefore Mr. Levitt abandoned his efforts to seek access to these documents. Because these documents are in the actual possession of government officials, and because those officials have demonstrated that access is strictly limited and is to be granted on a discretionary basis, we agree with Uranerz that it has no control over those documents. *Compare Societe Internationale, supra,* 357 U.S. at 204, 78 S.Ct. 1087.

We have now determined that, with certain exceptions regarding Denison U.S. and Uranerz, we have the power to issue a production order under Rule 37(a) against the eleven resisting defendants that are the subjects of plaintiffs' motions. The remaining question is whether we should exercise our discretionary power to issue those orders, after weighing the three factors described earlier in this memorandum. We conclude that we should.

The first consideration is the strength of the Congressional policies underlying the statute which forms the basis for plaintiffs' action. Plaintiffs' complaint challenges activities by the defendants which, if true, would constitute massive violations of this nation's antitrust laws. "These laws have long been considered cornerstones of this nation's economic policies, have been vigorously enforced and the subject of frequent interpretation by our Supreme Court." *United States v. First National City Bank,* 396 F.2d 897, 903 (2d Cir. 1968). "They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972). More specifically, Congressional concern with the very practices at issue

here, and with the antitrust implications of those practices, is evidenced by extensive subcommittee investigations into the alleged international uranium cartel. *See Hearings Before the Subcommittee on Oversight and Investigation of the House Committee on Interstate and Foreign Commerce,* 95th Cong., 1st Sess. (1977). Governmental concern with this issue achieved choate form when the Justice Department convened a grand jury which eventually charged Gulf with criminal antitrust violations arising out of the same transactions identified by Westinghouse. *United States v. Gulf Oil Corp.,* Cr. No. 78–123 (W.D.Pa. 1978). The existence of this public enforcement action does not supplant plaintiffs' private civil action. Indeed, Congress specifically intended to encourage civil antitrust actions by allowing private litigants to gain certain estoppel advantages from government antitrust actions. *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.,* 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). From these indicators, it is clear that the policies supporting an inquiry into corporate activities and structure are at least as weighty, and probably stronger, with the antitrust statutes here than they were with the Trading with the Enemy Act in *Societe Internationale. See* W. Fugate, *supra* at 122.

The second consideration is whether the requested documents are crucial to the determination of a key issue in the litigation. Plaintiffs' showing on this factor is simply overwhelming. All of the discovery requests now at issue are directly relevant to a number of fundamental issues in the complaint, answers, affirmative defenses and counterclaims in this litigation. Plaintiffs seek vital information relating to, among other things, the time period when the alleged conspiracy of uranium producers was carrying out its activities, defendants' alleged efforts to conceal their conspiracy, the impact of that alleged conspiracy on United States interstate and foreign commerce, the defendants' defenses of sovereign compulsion, and information on uranium sales and market conditions. Plaintiffs have submitted voluminous exhibits

which give a sketchy picture strongly supporting their allegations in these areas but also suggesting that there are larger gaps in defendants' document production.

The strength of plaintiffs' need for these documents is perhaps best demonstrated by these facts. First, Gulf has admitted the "establishment of an international uranium cartel under which price controls and market allocations were established" for at least some sales of uranium. (Gulf Brief, p. 18). Second, the information which plaintiffs seek is of such exceptional significance that three foreign governments have sought to authorize defendants to withhold that information for the express purpose of frustrating United States judicial inquiries into the activities of this cartel. Third, ten defendants have withheld documents under their control which are said to be within the scope of the secrecy legislation. The inevitable inference is that the withheld information is likely to be the heart and soul of plaintiffs' case.

Several defendants counter that the unproduced documents are merely cumulative of presently available discovery (Gulf, pp. 56–57) or that their own examination of the documents has convinced them that they have little significance to the case (Federal, pp. 14–15). These arguments were persuasively rejected by the district court in the *Societe Internationale* litigation:

> Under the rules of United States Courts a party is not required to accept the assurance of opposing counsel as to what has been made available. He is entitled to draw his own conclusions on examination of the papers. 111 F.Supp. at 442.

Other defendants argue that they are equally prejudiced by the nondisclosure laws, since they may be prevented from using exculpatory documents which are covered by those laws. (*See*, e. g. Noranda, pp. 24–25). However, the solution to this "problem" lies in the fullest possible disclosure, not in a mutual limitation on relevant information.

Finally, we recognize that, as one commentator has put it, "the heart of any American antitrust case is the discovery of business documents. Without them, there is virtually no case." Note, *Discovery of Documents Located Abroad in U.S. Antitrust Litigation: Recent Developments in the Law Concerning the Foreign Illegality Excuse for Non-Production*, 14 Va.J.Int'l. L. 747 (1974). That is especially true when plaintiffs allege an antitrust conspiracy which has taken deliberate and elaborate steps to cloak its activities. "If true, the nature of the activities must be ferreted out of dark and obscure corners." *Societe Internationale, supra*, 111 F.Supp. at 443. The documents at issue here are crucial to plaintiffs' proof.

The third consideration involves an appraisal of the chances for flexibility in a country's application of its nondisclosure laws. The degree of leniency in the application of the nondisclosure laws varies from country to country. South Africa has taken the most flexible position. It has allowed Westinghouse to inspect Utah's uranium-related documents in that country, and is currently considering a request from Engelhard to allow a similar inspection of its documents. Australia has rejected all past requests for a waiver of its regulations, but interprets its laws as authorizing the Attorney General to grant such waivers. The Attorney General is presently considering requests for waivers from Engelhard, Getty and Utah. Canada has taken a completely inflexible position. It has consistently rejected all requests for waivers, stating that its government officials have no authority to grant them. It has opposed Westinghouse's unsuccessful efforts to secure letters rogatory from a Canadian court for production of uranium-related documents. It has rejected all requests to modify or amend the regulations and has refused to give any assurances of non-prosecution for any violations. Canada has also sent numerous diplomatic notes to the U.S. State Department in which it has expressed a firm position that any disclosure of documents covered by its regulations would be inimical to its national interests. Canada's position has not been relaxed by its amicus submission.

**1156**

On balance, we have concluded the issuance of Rule 37(a) orders is required. The entry of such orders may lead to a further narrowing of the defendants' foreign law objections. That process has already been evidenced by the increased disclosures which have occurred since Westinghouse filed the present motions. Even if some defendants subsequently conclude, as they now suggest, that they have already done everything within their powers to comply with such an order, we do not think an order at this time would be a futile gesture. The order will serve to declare Westinghouse's right to the discovery it seeks, thereby framing the competing interests of the United States and the foreign governments on a plane where the potential moderation of the exercise of their conflicting enforcement jurisdictions can be meaningfully considered. We do not seek to force any defendant to violate foreign law. But we do seek to make each defendant feel the full measure of each sovereign's conflicting commands, so that, in the words of Chief Judge Kaufman of the Second Circuit, it now

> "must confront . . . the need to 'surrender to one sovereign or the other the privileges received therefrom' or, alternatively a willingness to accept the consequences."

*United States v. First National City Bank*, 396 F.2d 897, 905 (2d Cir. 1968).

Accordingly, plaintiffs' motions to compel Utah, Gulf, GMCL, Noranda, Denison Canada, Engelhard, Getty, Federal, and Rio U.S. to produce foreign documents are granted in their entirety and are granted in part and denied in part as to Uranerz and are denied as to Denison U.S. Defendants' alternative objections to production of foreign documents on grounds such as attorney-client privilege and overbroad definitions are reserved for ruling at such time as defendants announce their ability to comply with this order. Production hereunder to be made on or before January 2, 1980.

The motions of defendants Getty, Gulf and Utah to compel Westinghouse to comply with Pretrial Order No. 5 are granted in part and Westinghouse is directed to provide defendants with a list identifying the foreign documents which it has produced from its domestic files.